**RAILROAD COMMISSION OF TEXAS
and Bill Forney, Inc., Petitioners,**

v.

**PEND OREILLE OIL & GAS
COMPANY, INC., et al.,
Respondents.**

No. C–9937.

Supreme Court of Texas.

June 5, 1991.

Rehearing Overruled Sept. 11, 1991.

Dan Morales, Atty. Gen., Robert L. Seibert, Don Walker, Asst. Attys. Gen., David W. Nelson and Norman M. Bonner, Akin, Gump, Strauss, Hauer & Feld, Skipper Lay, and Brian R. Sullivan, Austin, for petitioners.

Dan Moody, Jr., Graves, Dougherty, Hearon & Moody, Austin, for respondents.

## OPINION

CORNYN, Justice.

This case involves the application of the Mineral Interest Pooling Act (MIPA)[1] by the Texas Railroad Commission to a pooled gas unit in Live Oak County. The interest owner who was force pooled appealed the commission's decision through the adminis-

trative appeals process to the court of appeals. That court reversed in part, affirmed in part and partially vacated the district court's judgment, which affirmed the commission's order. 788 S.W.2d 878. The MIPA applicant, the MIPA contestant and the commission filed applications for writ of error, all of which we granted. This case presents three main questions. First, did the MIPA applicant make a fair and reasonable offer to pool voluntarily? Second, may the commission force pool, in a single MIPA proceeding, separate deposits of gas in man-made communication through a common well bore? Third, may the commission enter a final order in a MIPA proceeding that establishes an effective date which is coincident with the date of an earlier interim order entered in the same proceeding? We answer each of these questions in the affirmative. Consequently, we affirm the court of appeals' judgment in part and reverse in part.

## I. FACTS

On June 13, 1981, the Limes (Wilcox 9900) Field was discovered. This field consists of two natural gas reservoirs. In 1983, the L.L. Bennett *et al.* Gas Unit was established within the field. Pend Oreille Oil & Gas Company, Inc. is the working interest owner and operator of a producing gas well within the Bennett Unit. Next to the Bennett Unit are two tracts of land under an oil, gas and mineral lease to Bill Forney, Inc. Most of the Bennett Unit is within the Limes Field, but only a small portion of the Forney acreage extends into the Limes Field.

In 1983, a controversy developed concerning both the horizontal and vertical productive limits of the Limes Field and the allocation of allowables in the field, which, at that time, were allocated on a surface-acreage basis. On November 23, 1983, Pend Oreille filed an application with the commission to resolve the dispute. In December, the commission began hearings (productive acreage hearings), which consisted of approximately twenty days of hearings spread over more than a year. The commission's final order, of September

---

1. Tex.Nat.Res.Code Ann. §§ 102.001–.112 (Vernon 1978).

9, 1985, delineated the productive limits of the Limes Field and established productive net acre-feet as the basis for allocation of production.

Additionally, the commission's final order in the productive acreage hearings contained a finding that the Limes Field was underlain by two, separate, noncommunicating sand bodies known as the Main and Stray Sands. Previously, these sands were believed to be a common reservoir; however, during the productive acreage hearings, the Main Sand was determined to be at a deeper interval and separated by twenty-five feet of intervening shale from the Stray Sand. The commission also found: (1) the Main Sand does not appear to grow upward toward the Stray Sand; (2) the Stray Sand is a "stringer"[2] of the Main Sand; (3) these sands underlie portions of both the Forney acreage and the Bennett Unit; (4) the well bore from the Bennett Well perforates both sands and causes the commingling of gas from both reservoirs in the well bore; (5) production from the Bennett Well has been draining gas from beneath the Forney acreage; (6) it is not possible to isolate the Stray Sand from the Main Sand body because of the risk of formation damage and loss of one or both zones; (7) the productive acreage of the Main Sand would be calculated using the new, net acre-feet formula; and (8) the method for determining the productive acres in the Stray Sand would remain a surface-acreage formula. In light of all these findings, the commission granted a statewide rule 10 exception[3] to permit downhole commingling[4] in the Limes Field

in those wells where it occurred. Pend Oreille did not appeal this final order.

Shortly after Pend Oreille filed its application in the productive acreage hearings, Forney made a written offer to it and all other interest owners in the Bennett Unit to pool voluntarily. Because Pend Oreille did not respond to the offer, Forney filed an application with the commission under the provisions of the MIPA. Forney's application sought an order establishing a 340-acre unit in which the productive acres of the Bennett Unit and the Forney tracts would be pooled.

On April 5, 1984, and on June 20, 1984, the commission held hearings on Forney's application (the MIPA proceedings). Because matters pertinent to the MIPA proceedings were going to be determined in the productive acreage hearings, the commission temporarily abated the MIPA proceedings and entered an interim order on May 7, 1984. This was done to regulate the private interests in the Bennett Well as if the proposed unit were formed and to protect Forney from economic injury. This order (1) established that 289 acres of the Bennett Unit and 36 acres of the Forney acreage are productive in the Limes Field, (2) granted the Bennett Unit a production allowable equal to that which would be granted a 325-acre unit in the Limes Field, pending a final order on the application, (3) provided that any allowable increment granted in the order would be rescinded and subject to make-up if the commission denied Forney's application, (4) ordered that proceeds attributable to the production allowable for acreage in excess of the 266

---

2. A stringer is "[a] seam of rock between seams of coal or Devonian shale." 8 H. Williams & C. Meyers, *Oil and Gas Law, Manual of Oil and Gas Terms* 947 (7th ed. 1987).

3. Tex.R.R.Comm'n, 16 Tex.Admin.Code § 3.10(b) (West Sept. 1, 1988).

4. Downhole commingling refers to the production of oil or gas from different strata through the same string of casing. *See id.* § 3.10(a); *see also* Douglass & Whitworth, *Practice Before the Oil and Gas Division of the Texas Railroad Commission,* 13 St. Mary's L.J. 719, 733 (1982). "Normally, operators who drill wells that pass through several different strata must install a separate string of casing to produce from each

stratum, and each stratum is regulated under its own field rules. Without separate casing, gas from a high-pressure zone can move through the well bore and enter a zone with low pressure, causing a loss of recoverable hydrocarbons. However, in some fields, production by downhole commingling will not cause waste; indeed, it can be an efficient way of producing gas in lenticular fields that consist of many thin layers of sands, called 'stringers,' which cannot justify the costs of separate well completions and individual casings." 2 E. Smith & J. Weaver, *Texas Law of Oil and Gas* § 10.4(C)(1), at 333 (1990).

acres currently assigned to this well be paid into an escrow account, and (5) stated that the interim order would be superseded by entry of the final MIPA order.

For a time, Pend Oreille complied with the MIPA interim order to pay some of the proceeds from the Bennett Well's production into an escrow account. However, after the commission issued its final order in the productive acreage hearings, Pend Oreille stopped paying the proceeds into escrow. On June 20, 1986, Pend Oreille wrote the commission examiner in the MIPA proceeding, notifying him that it had stopped putting funds in escrow because the final order in the productive acreage hearings had changed the method for calculating allowables and failed to provide it with any additional acre-feet.

On June 6, 1987, the commission examiners submitted their amended Proposal For Decision (PFD), recommending that the Forney acreage be pooled into the existing Bennett Unit. The examiners decided that both the Main Sand and Stray Sand should be pooled. They found this action necessary to protect Forney's correlative rights, and that this was a more efficient use of resources than adopting Pend Oreille's position, which would require separate proceedings for each of the two sands.

Additionally, the examiners recommended that the commission adopt an effective date of 16 months before the issuance of the final order in the MIPA proceeding; that is, the period of time between the entry of the interim order in the MIPA proceedings and the entry of the final order in the productive acreage hearings. They based this recommendation upon the assumption that the interim order's effectiveness ceased when the commission changed the allocation formula for the field in the final order of September 9, 1985 in the productive acreage hearings.

On August 24, 1987, the commission entered its final MIPA order establishing a new gas unit that included the existing Bennett Unit and the Forney acreage lying within the Limes Field. This order force pooled the Main and Stray Sands as if they were a common reservoir. The commis-

sion's final order, however, did not adopt the examiners' recommendation for the effective date of the final MIPA order. Instead, the commission made the final order effective on May 7, 1984 (the date of the MIPA interim order). In changing the proposed effective date, the commission found:

> An effective date of May 7, 1984, for the proposed unit will equitably allocate production and costs among said unit's owners because the subject well has been draining the proposed unit area, or its equivalent, since before this MIPA application was filed. The Commission issued an Interim Order in this Docket on May 7, 1984, treating the proposed unit as if it were established relative to Commission regulation of production from the subject well and to the mineral owners' interests, and providing the parties with a reasonable expectation the Commission by Final Order would establish a pooled unit pursuant to the subject application thereby continuing the effect of the Interim Order on the mineral owners' interests in production from the subject well.

Pend Oreille appealed from this final order, and the district court affirmed. Pend Oreille appealed, once again.

The court of appeals reversed in part, affirmed in part and partially vacated the district court's judgment. The court of appeals held that the commission had no authority to force pool the Main and Stray Sands as a common reservoir. 788 S.W.2d at 883. The court found that the commission correctly determined that Forney's offer to pool voluntarily was fair and reasonable. *Id.* at 884. Finally, the court found that "the final MIPA order establishing a retroactive date of May 7, 1984 is constitutional as applied to the period of May 7, 1984 to September 8, 1985, but that it is unconstitutional as applied to the period of September 9, 1985 to August 24, 1987." *Id.* at 886.

## II. FORNEY'S OFFER TO POOL VOLUNTARILY

### A. *Fair and Reasonable Offer Requirement*

 Before the commission may establish a pooled unit, the MIPA applicant must

make a fair and reasonable offer to pool voluntarily to the other interest owners in the proposed unit. Tex.Nat.Res.Code § 102.013. The commission has authority to create a pooled unit only when "the owners have not agreed to pool their interests." *Id.* § 102.011. If the commission finds that the applicant did not make a qualifying offer, it lacks jurisdiction over the petitioner's application and must dismiss it. *Carson v. Railroad Comm'n,* 669 S.W.2d 315, 318 (Tex.1984); *Windsor Gas Corp. v. Railroad Comm'n,* 529 S.W.2d 834, 837 (Tex.Civ.App.—Austin 1975, writ dism'd as moot); Tex.Nat.Res.Code § 102.013(b).

This requirement, probably more than any other aspect of the MIPA, makes the Texas Act unique, compared to the compulsory pooling acts of other states. 3 E. Smith & J. Weaver, *Texas Law of Oil and Gas* § 12.3(B)(1)(a), at 23 (1990) [hereinafter Smith & Weaver]; Douglass & Whitworth, *Practice Before the Oil and Gas Division of the Railroad Commission of Texas,* 13 St. Mary's L.J. 719, 743 (1982) [hereinafter Douglass & Whitworth]; Smith, *The Texas Compulsory Pooling Act,* 43 Texas L.Rev. 1003, 1009 (1965) [hereinafter Smith, *Texas Compulsory Pooling Act*]. The obvious intent of the legislature is to encourage voluntary pooling. The Act, then, is more aptly described as "an Act to encourage voluntary pooling—rather than an Act to provide compulsory state action." Smith, *Texas Compulsory Pooling Act* 1009.

Reasonable minds may, of course, differ on what constitutes a fair and reasonable offer. Because the MIPA does not define the phrase "fair and reasonable offer to pool voluntarily," this is left to the commission's discretion. 3 Smith & Weaver § 12.3(B)(1)(a), at 23-0. Not surprisingly, application of this standard has been often litigated. *See, e.g., Carson v. Railroad Comm'n,* 669 S.W.2d 315 (Tex.1984); *Railroad Comm'n v. Broussard,* 755 S.W.2d 951 (Tex.App.—Austin 1988, writ denied); *American Operating Co. v. Railroad Comm'n,* 744 S.W.2d 149 (Tex.App.—Hous-

ton [14th Dist.] 1987, writ denied); *Buttes Resources Co. v. Railroad Comm'n,* 732 S.W.2d 675 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.); *Windsor Gas Corp. v. Railroad Comm'n,* 529 S.W.2d 834 (Tex.App.—Austin 1975, writ dism'd as moot). The MIPA provides that a person affected by a commission pooling order "is entitled to judicial review of that order in a manner other than by trial de novo." Tex. Nat.Res.Code § 102.111.

B. *Administrative Procedure and Texas Register Act (APTRA)* [5]

■ Section 19 of the APTRA sets the standards for judicial review of agency actions, including those of the Railroad Commission. *Imperial Am. Resources Fund, Inc. v. Railroad Comm'n,* 557 S.W.2d 280, 283 (Tex.1977). If the manner of review authorized by the law governing the agency's decision is "other than by trial de novo," the court, sitting without a jury, may only review the decision of the agency on the basis of the agency record. Tex. Rev.Civ.Stat.Ann. art. 6252–13a § 19(d)(3); *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 571 S.W.2d 503, 508 (Tex.1978). How rigorously a court conducts "other than by trial de novo review" depends on whether the legislation that is the basis for the agency's action provides for the scope of review. "Where the law ... does not define the scope of judicial review, the court may not substitute its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion but may affirm the decision of the agency in whole or in part and shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced...." Tex. Rev.Civ.Stat.Ann. art. 6252–13a § 19(e). Substantial rights of the appellant may be prejudiced when administrative findings, inferences, conclusions, or decisions are:

 (1) in violation of constitutional or statutory provisions;
 (2) in excess of statutory authority of the agency;
 (3) made upon unlawful procedure;
 (4) affected by other error of law;

**5.** Tex.Rev.Civ.Stat.Ann. art. 6252–13a (Vernon Supp.1991).

(5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

Subsection (5) articulates what is commonly known as the substantial evidence rule. At its core, the substantial evidence rule is a reasonableness test or a rational basis test. *See Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 453 (Tex.1984) ("[T]he agency's action will be sustained if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action."); *accord Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938) ("Substantial evidence ... means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). The reviewing court, then, concerns itself with the *reasonableness* of the administrative order, not the *correctness* of the order. *Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 117 (Tex.1988); *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer,* 662 S.W.2d 953, 956 (Tex.1984). The rule prevents the court from "usurping the agency's adjudicative authority even though the court would have struck a different balance." *Sizemore,* 759 S.W.2d at 117; *Gerst v. Goldsbury,* 434 S.W.2d 665, 667 (Tex.1968).

### C. Discussion

■ The MIPA does not state the scope of review courts are to use when examining commission conclusions that a fair and reasonable offer to pool voluntarily was made. *Carson v. Railroad Commission of Texas* states that the proper review is a "jurisdictional review," not substantial evidence review under APTRA section 19(e)(5). 669 S.W.2d at 316. In *Carson,* the threshold issue was the meaning of section 102.013(c) [6] of the MIPA. Subsection (c) gives some meaning to the phrase "fair and reasonable offer to pool voluntarily" contained in section 102.013(b). The *Carson* court of appeals' construction of subsection (c) would simply have required that an offer by an interest owner to share on the same yardstick basis as other interest owners in the proposed unit is all that is required under section 102.013. *Id.* This, we said, is not the only criterion. *See id.* Rather, we stated that "the offer must be one which takes into consideration those relevant facts, existing at the time of the offer, which would be considered important by a reasonable person in entering into a voluntary agreement concerning oil and gas properties." *Id.* at 318.

Because of the *Carson* court of appeals' misinterpretation of subsection (c), its application of the established facts to the statutory phrase "fair and reasonable offer to pool voluntarily" in subsection (b) was incorrect as a matter of law. We, therefore, were not constrained by the substantial evidence rule in reviewing its construction, because there was no need to examine the administrative record for substantial evidence supporting the court of appeals' construction. We nevertheless held that courts are required to review commission *findings about and conclusions of* fair and reasonable offers to pool by examining those relevant facts which existed at the time of the offer. *See id.* To do so, courts must apply the substantial evidence rule under APTRA section 19(e)(5).

Once we held, as a matter of law, that the *Carson* court of appeals' interpretation of MIPA subsection (c) was erroneous, it followed that the court of appeals' application of that erroneous standard to the established facts was likewise erroneous as a matter of law. We made our statement about "jurisdictional review" because we were deciding the question of the commission's jurisdiction as a matter of law. We were not delving into the administrative record to determine whether there was sub-

---

**6.** "An offer by an owner of a royalty or any other interest in oil or gas within an existing proration unit to share on the same yardstick basis as the other owners within the existing proration unit are then sharing shall be considered a fair and reasonable offer."

stantial evidence supporting the commission's conclusion that a fair and reasonable offer to pool existed. Rather, we simply examined the record to ascertain whether the commission took into consideration those relevant facts, and we ultimately determined that it did not.

It is in this context, then, that our statement about "jurisdictional review" should be understood. "Jurisdictional review" was limited to the narrow issue presented in *Carson*. It is not some talismanic incantation that permits courts to freely substitute their judgment for that of the administrative agency. When we referred to "jurisdictional review" in *Carson*, it did not eliminate the requirement of substantial evidence review of commission findings of a "fair and reasonable offer to pool voluntarily." "Jurisdictional review" does not mean that courts decide the question of whether an offer to pool voluntarily is fair and reasonable without some deference to the commission's fact-finding. The commission's application of the statutory term to the facts in each case is conclusive, unless it is unreasonable. Therefore, courts must apply the substantial evidence rule under APTRA section 19(e)(5) to determine if the commission's conclusion of a fair and reasonable offer to pool voluntarily is reasonable.

■ We now apply APTRA section 19(e)(5) to the facts of this case. In a letter dated December 22, 1983, Forney made a pooling offer to Pend Oreille and the other interest owners in the Bennett Unit. Forney sought to pool the productive portions of its lots with the productive acreage in the existing Bennett Unit. Since the productive acreage hearings were underway, Forney proposed that the determination of the productive portions of the proposed unit be based upon those proceedings. Alternatively, Forney proposed that the productive acreage be determined by agreement of the parties. Forney stated that, at that time, it believed approximately 50 of its acres were productive in the Limes Field and that approximately 290 acres of the Bennett Unit were productive in the field.

Forney also proposed that production from the existing Bennett Well, and all applicable drilling and completing costs, be allocated to each tract in the unit based on each tracts' share of the productive acreage in the unit. Under this proposal, Pend Oreille and its interest owners would retain 85.3 percent of the production and be assessed 85.3 percent of the cost. Forney's percentage of production and cost would be 14.7. In another option, Forney offered to base the owners' participation on the commission's ruling in the productive acreage hearings. Each lease holder was to work out his share of production with the other interest owners in their respective tracts. Forney offered to pay its appropriate share, determined on a productive-acreage basis of the cost of drilling and completing the Bennett Well, as soon as the proposed unit became effective and the costs could be ascertained. Furthermore, Forney agreed to a 100 percent risk factor and to pay its proportionate share of all drilling and completion costs and, further, to participate from the date of first production from the well.

Forney also proposed that Pend Oreille remain the operator of the well, that the proposed unit continue to utilize the current operating agreement, and that each party pay, on a productive-acreage basis, its proportionate share of the operating costs of the Bennett Well. Forney offered to pay its share on the basis of billings furnished in the usual manner. Under Forney's proposal, each party that had paid its share of drilling and completion costs (and any applicable risk factor) would pay its share of operating costs. The proportionate share of operating costs for any party who had not paid its share of drilling and completion costs would be deducted from the recipient's share of production. Forney proposed an effective date of January 1, 1984.

At the time of the offer, allowables in the Limes Field were allocated on a productive surface-acreage basis. Production from the Bennett Well, too, was apportioned based on productive surface ownership. At the time of Forney's offer, Pend Oreille had already applied to amend the

field rules to an acre-feet basis. Pend Oreille did not know whether the Stray Sand was separate and distinct from, or common to, the Main Sand, but it treated them as common pursuant to commission regulation. Neither was Pend Oreille aware of what the other interest owners' positions would be concerning whether field allowables should be allocated on a surface-acre formula or a net acre-feet formula. Pend Oreille did not respond to Forney's offer to pool in any fashion.

The commission found Forney's offer fair and reasonable based upon the rationale in the examiners' amended PFD. The examiners noted that, at the time of Forney's offer, the Limes Field was treated, by everyone concerned, as a common reservoir.

The examiners also determined that Forney's offer to pool voluntarily, based on an upcoming commission determination in the productive acreage hearings, was fair and reasonable from the perspective of the party being force pooled. The examiners noted that there were differences of opinion about the most fair and reasonable allocation of interests, and the outcome of the productive-acreage hearings determining this issue was not predictable. They reasoned that, although Pend Oreille may have been reluctant to act on Forney's offer because of uncertainty due to an upcoming field rules hearing, this fact did not make Forney's offer unfair or unreasonable.

Furthermore, they noted that MIPA section 102.051 requires allocation of production on a surface-acreage basis unless the commission finds that such allocation does not allocate to each tract its fair share. Tex.Nat.Res.Code § 102.051. The commission did not change the basis of allocation from surface acreage to net acre-feet until approximately 21 months after Forney's offer. The examiners, therefore, reasoned that until the commission determined that surface acreage does not allocate each tract its fair share, an offer to pool on a surface-acreage basis was fair and reasonable.

Finally, the examiners observed that Pend Oreille did not respond to Forney's offer by counteroffer, or even indicate that it considered the offer to be inadequate. This lack of response, they determined, frustrates the purpose of the MIPA, which is to encourage voluntary pooling. And, although the MIPA does not require a counteroffer, it is a factor to consider in determining whether an offer is fair and reasonable. *See American Operating Co. v. Railroad Comm'n,* 744 S.W.2d 149, 154 (Tex.App.—Houston [14th Dist.] 1987, writ denied).

We conclude that the commission's finding that Forney made a "fair and reasonable offer to pool voluntarily" is supported by substantial evidence. The court of appeals was correct in finding that Forney had invoked the commission's jurisdiction pursuant to MIPA section 102.013(b).

## III. COMMON RESERVOIR

### A. *Introduction*

We next consider whether the Railroad Commission may force pool, in a single MIPA proceeding, separate deposits of gas not in natural communication but in man-made communication through a common well bore. Pend Oreille contends that pooling the Main and Stray Sands in one proceeding was beyond the commission's scope of pooling authority. The commission, Pend Oreille argues, should have held separate hearings for pooling the two sands. Pend Oreille specifically argues: (1) that the term "common reservoir" limits the commission to pooling single reservoirs, which are separate and not in natural communication, (2) that the term is unambiguous and has always been understood to mean a single source of supply, all parts of which are in natural (not man-made) communication, and (3) that the legislature intends for the "common reservoir" language to be a limit on the commission's pooling authority.

On the other hand, Forney and the commission urge us to construe "common reservoir" in a manner that allows the commission to pool separate lenticular reser-

voirs[7] as a "common reservoir" where a common well bore perforates both reservoirs and causes downhole commingling. They argue that the MIPA does not distinguish between reservoirs that are in communication through man-made versus natural means. According to Forney and the commission, the pooling of these sands furthers the purposes of the MIPA, prevents confiscation and promotes administrative efficiency.

### B. *Statutory Construction*
#### 1. Natural Resources Code

■ The MIPA allows the commission to pool two or more separately owned tracts of land that "are embraced in a common reservoir of oil and gas for which the commission has established the size and shape of proration units...." Tex.Nat.Res.Code § 102.011. The MIPA does not define "common reservoir." However, chapter 86 of the Natural Resources Code defines it as: "[A]ll or part of any oil or gas field or oil and gas field that comprises and includes any area that is underlaid or that, from geological or other scientific data or experiments or from drilling operations or other evidence, appears to be underlaid by a common pool or accumulation of oil or gas or oil and gas." *Id.* § 86.002(4). Chapter 85 states that the term "common reservoir" means "common pool," "pool," "field," or "common source of supply." *Id.* § 85.001(a)(2). "Pool" means "an underground reservoir containing a connected accumulation of crude petroleum oil, or natural gas, or both." *Id.* § 85.001(a)(3). None

of these definitions addresses the specific issue here.

In 1979 and 1981, the legislature enacted what are commonly referred to as the commingling statutes. *See* Tex.Nat.Res.Code §§ 85.046, 85.053, 85.055, 86.012, 86.081. Since their enactment, the commission's position has been that it has the power to pool lenticular reservoirs, not in natural communication but in man-made communication, as if they are a "common reservoir."[8] The court of appeals below held that the commission had no such authority. 788 S.W.2d at 883. The court relied on *Railroad Commission of Texas v. Bishop Petroleum, Inc.,* which addressed the same issue. 736 S.W.2d 724 (Tex.App.—Waco 1987), *aff'd in part & rev'd in part on other grounds per curiam,* 751 S.W.2d 485 (Tex.1988). Both the Bishop court and the court below adopted the definition of "common reservoir" enunciated by this court in the cases of *Railroad Commission of Texas v. Graford Oil Corp.,* 557 S.W.2d 946 (Tex.1977), and *Gage v. Railroad Commission of Texas,* 582 S.W.2d 410 (Tex.1979).

#### 2. *Graford* and *Gage*

In *Graford,* we addressed the question whether the Railroad Commission had the authority to enter an order that combined nine separate, noncommunicating gas fields into one field and issued spacing and production rules applicable to the consolidated field. 557 S.W.2d at 948. Following our

---

7. "A lens of porus and permeable sediments surrounded by strata of low permeability, often shale. There may be a number of such lens unconnected with each other in an area. Such reservoirs are often small, but completely saturated with oil or gas. The shoestring sands of the mid-continent region are notable examples of lenticular reservoirs." *Railroad Comm'n v. Graford Oil Corp.,* 557 S.W.2d 946, 951 n. 5 (Tex.1977) (quoting 7 H. Williams & C. Meyers, *Oil and Gas Law, Manual of Oil and Gas Terms* 318 (1976)).

8. The commission's approach to this situation has been described as follows:

The commission's authority seems limited to pooling in a single reservoir rather than pooling all horizons from the surface to the base of the sand actually being produced or pro-

posed as the bottomhole location. In fields with several distinct horizons clearly separated from each other, this limitation on the commission's pooling power has not caused difficulties. An applicant wishing to pool into several distinct horizons must file separate pooling applications for each horizon.

However, in lenticular reservoirs, comprised of many layers of "shoestring sands," it is often difficult to determine the limits of the many small producing lenses or horizons lying under or next to each other. The Railroad Commission allows producers in lenticular reservoirs to commingle production from several strata in a single well bore when necessary to prevent waste or protect correlative rights.

3 Smith & Weaver § 12.3(A)(3), at 19–20.

earlier decisions,[9] we stated that the statute granting the commission authority to regulate the production in natural gas fields only authorized the commission to prorate and regulate daily gas production from a common reservoir. *Id.* at 949–50. The prorationing statutes, we stated, did not authorize the commission to combine separate reservoirs into a single field for proration purposes for administrative convenience. We held that "a common pool or a common accumulation of hydrocarbons, separate and distinct pools of oil or gas, which are not connected, and which do not communicate with one another, do not constitute a 'common reservoir.'" *Id.* at 950. We further held the commission's consolidation order invalid because the commission's fact findings did not support the conclusion that the consolidated field was a common reservoir. *Id.* at 951.

We reaffirmed *Graford* in *Gage v. Railroad Commission of Texas*, 582 S.W.2d 410 (Tex.1979). *Gage* involved the Boonsville Field, which consisted of several separate and distinct lenticular and multi-stratigraphic reservoirs of natural gas. *Id.* at 412, 414 n. 3. Once again, we examined the commission's statutory authority to prorate the production of natural gas and determined that the pertinent statutory provisions only sanctioned prorationing of common reservoirs. Despite the commission's ultimate finding that Boonsville was a common source of supply of natural gas, examination of the commission's underlying findings of fact revealed that Boonsville was, in truth, a consolidation of several separate and distinct "common reservoirs." Thus, we held that the commission was without statutory authority to reinstate proration or to issue proration orders. *Id.* at 415.

Following *Gage*, the commission began denying all requests for commingling to maintain the integrity of the prorationing system. 2 Smith & Weaver at 334. This led to the inability of operators to recover oil and gas from separate and distinct deposits, and consequently, oil and gas production was not recoverable from certain lenticular reservoirs. *Id.* In response, the Texas Legislature, in 1979, enacted Senate Bill 257. It amended sections 85.046 and 86.012 of the Natural Resources Code to authorize the commingled production of oil and gas in certain cases to prevent waste, to promote conservation, or to protect correlative rights. Act of May 29, 1979, 66th Leg., R.S., ch. 300, §§ 1 & 2, 1979 Tex.Gen. Laws 673, 673–75 (codified at Tex.Nat.Res. Code §§ 85.046, 86.012). In its final form, the bill did nothing more than allow downhole commingling of production. It did not permit the prorationing of commingled production.

After the bill became law, the commission amended statewide rule 10 (previously a total prohibition of downhole commingling) to allow exceptions for commingling when necessary to prevent waste, to promote conservation or to protect correlative rights. Tex.R.R.Comm'n, 4 Tex.Reg. 3082 (1979) (codified at 16 Tex.Admin.Code § 3.10(b) (West Sept. 1, 1988)). Rule 10 was further amended to provide that commingled production, pursuant to an exception under the rule "shall be considered production from a common source of supply for purposes of proration and allocation." *Id.* (codified at 16 Tex.Admin.Code § 3.10(c)).

The impact of Senate Bill 257 on the *Graford* and *Gage* decisions was at issue in *Railroad Commission of Texas v. Mote Resources*, which again involved the Boonsville Field. 645 S.W.2d 639 (Tex.App.— Austin 1983, no writ). The court of appeals, agreeing with the district court, held that the bill did not overrule *Graford* and *Gage*. It stated that "[t]he effect of the bill, as passed, [does] nothing more than to put a legislative stamp of approval upon the long-standing practice of allowing the *production* of oil or gas from separate accumulations that have been connected through a common well bore[,]" and noting that "[t]he bill makes no attempt to deal with the issue of proration." *Id.* at 644

**9.** *Railroad Comm'n v. Shell Oil Co.*, 380 S.W.2d 556 (Tex.1964); *Benz–Stoddard v. Aluminum* *Co. of Am.*, 368 S.W.2d 94 (Tex.1963).

(emphasis in original). While the case was pending in the court of appeals, the legislature enacted Senate Bill 1146, which finally granted the commission authority to prorate production from commingled zones as if they were a common reservoir. Act of June 16, 1981, 67th Leg., R.S., ch. 688, §§ 1–3, 1981 Tex.Gen.Laws 2578, 2578–80 (codified at Tex.Nat.Res.Code §§ 85.053, 85.055, 86.081). The court of appeals observed that Senate Bill 1146 clearly had the effect of overturning *Graford* and *Gage*. *Mote*, 645 S.W.2d at 644.

The court of appeals below wrote that "[t]he Legislature's reaction to *Graford, Gage*, and *Mote Resources* demonstrates its hesitancy to grant the Commission a broad, general power to regulate commingled oil and gas." 788 S.W.2d at 882. The Waco court of appeals, in *Railroad Commission of Texas v. Bishop Petroleum, Inc.*, likewise stated, *in dictum*, that the legislature's expansion of the commission's regulatory authority over commingled reservoirs did not extend to the commission's pooling authority under the MIPA. 736 S.W.2d at 732. We disagree with and disapprove of both courts of appeals' statements. The legislature *does* intend the Railroad Commission to have discretion in regulating commingled oil and gas, including pooling. The ultimate outcome of the Boonsville Field cases demonstrates how the legislature resisted an interpretation of the term "common reservoir" that would have limited the commission's regulatory authority.

### 3. Commingling statutes

Senate Bill 1146 amended section 86.081 of the Natural Resources Code by adding subsection (b). In light of the judicial action and legislative reaction in the Boonsville cases, the language in section 86.081(b) is significant. It provides:

When, as provided in Subsection (b) of Section 85.046 or Subsection (b) of Section 86.012 of this code, as amended, the commission has permitted production by commingling oil or gas or oil and gas from multiple stratigraphic or lenticular accumulations of oil or gas or oil and gas, the commission may *prorate, allocate, and regulate* the production of such commingled, separate multiple stratigraphic or lenticular accumulations of oil or gas or oil and gas as if they were a single common reservoir...."

Tex.Nat.Res.Code § 86.081(b) (emphasis added). We interpret the words "prorate, allocate, and regulate," and especially the broad word "regulate," to evidence an intention to grant the commission broad authority over gas production from commingled reservoirs. The MIPA is one means by which the commission exercises its regulatory authority over oil and gas production.

Furthermore, section 86.081(b)'s reference to sections 85.046 and 86.012 of the code is significant. These sections both address and define "waste of gas." Section 85.046 is located in subchapter C of Chapter 85 of the code and is entitled "PROVISIONS GENERALLY APPLICABLE TO THE CONSERVATION OF OIL AND GAS." Section 86.012 is located in Chapter 86 of the code, which is entitled "REGULATION OF NATURAL GAS." Subsections (b) of these provisions both provide:

Notwithstanding the provisions contained in this section or elsewhere in this code or in other statutes or laws, the commission may permit production by commingling oil or gas or oil and gas from multiple stratigraphic or lenticular accumulations of oil or gas or oil and gas where the commission, after notice and hearing, has found that producing oil or gas and oil and gas in a commingled state will prevent waste, promote conservation, or protect correlative rights.

Tex.Nat.Res.Code §§ 85.046, 86.012. These general provisions show the legislature's intention to permit gas production from commingled reservoirs, regardless of any other provisions to the contrary, if commingling is necessary to achieve the stated objectives. The stated objectives in subsections (b) are virtually identical to the stated purposes of the MIPA; they are to avoid drilling unnecessary wells, protect correlative rights and prevent waste. To the extent that commingling of separate

gas reservoirs not in natural communication achieves these objectives, the commission may permit such commingling in the exercise of its pooling authority.

We conclude that the legislature intended that the commission have the authority to decide what constitutes a "common reservoir" for the purposes of the MIPA.

C. *Reasonableness of Commission's Construction*

■ The commission's examiners reasoned that pooling should be ordered in one MIPA proceeding because (1) this approach would achieve the general purposes of the MIPA; (2) there is no logical reason to treat the two sands as a "common reservoir" for proration and allocation purposes, but not for pooling purposes; (3) adopting Pend Oreille's position would be an inefficient use of administrative resources; and (4) Pend Oreille's construction would undermine the MIPA's effectiveness. Pursuant to APTRA section 19(e)(5), we conclude that the commission's application of the term "common reservoir" to the facts of this case is reasonable. We hold that the court of appeals erred in reversing that portion of the commission's order pooling both the Main and Stray Sands as a common reservoir.

## IV. EFFECTIVE DATE OF MIPA FINAL ORDER

■ We next consider whether the commission may enter a final order in a MIPA proceeding that establishes an effective date which is coincident with the date of an earlier interim order entered in the same proceeding. Article I, section 16 of the Texas Constitution provides: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." A retroactive law is one that affects acts or rights which accrued before it became effective. *See Inman v. Railroad Comm'n*, 478 S.W.2d 124, 129 (Tex.Civ.App.—Austin 1972, writ ref'd n.r.e.). The effective date of a force-pooling order entered by the Railroad Commission that is earlier than the date the order is signed can be an unconstitutional, retroactive interference with vested proper-

ty rights. *Buttes Resources Co. v. Railroad Comm'n*, 732 S.W.2d 675, 682 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.); *American Operating Co. v. Railroad Comm'n*, 744 S.W.2d 149, 156 (Tex. App.—Houston [14th Dist.] 1987, writ denied). This is because a retroactive pooling order may interfere with existing unit interest owners' property rights in production, and the proceeds therefrom, that have vested before pooling. The proceeds from such production, produced in compliance with then-existing commission rules and regulations, may have since been disbursed among the various interest owners. A retroactive pooling order, then, interferes with these vested rights by modifying the ownership of production that has been collected, sold and the proceeds remitted to interest owners under then current commission orders.

On the other hand, the problem with making a pooling order prospective only is that a pooling applicant's lands are being drained during the inevitable lag from an application for a force pooling order to the final order. To rectify this situation and avoid the proscriptions of *Buttes* and *American Operating*, the commission has adopted the practice of issuing an interim order if it appears that the pooling application has merit. These interim orders require the operator of the existing unit to escrow the proceeds that would belong to the successful pooling applicant if the parties were force pooled. 3 Smith & Weaver § 12.5(B)(3), at 52. Theoretically, if the amount escrowed is equal to or exceeds the interest due the successful pooling applicant after the final order is entered, there is no impairment of vested rights. However, if the amount escrowed is less than the amount owing to the successful pooling applicant, a constitutional issue arises because the past production has already vested in, and the proceeds remitted to, the existing interest owners.

Here, the court of appeals held that application of the final MIPA order between September 9, 1985 and August 24, 1987, contradicted the rule established by *Buttes* and *American Operating*. A key factor in

the court's decision was that the final order in the productive acreage hearings changed the method of calculating allowables. This change, the court of appeals reasoned, meant that there was no longer any extra allowable provided for Pend Oreille to escrow on Forney's behalf. Because the final order in the productive acreage hearings did not provide for any new, supplementary allowable, the court reasoned that the retroactive effective date of the final MIPA order interfered with Pend Oreille's vested property rights. Moreover, the court placed upon Forney the burden of obtaining either a modification of the interim order or an additional allowable under the final productive acreage hearing order. The court of appeals wrote that "if any party had an obligation to either seek modification of the interim order or request that an additional allowable be provided for in the final [productive acreage hearings] order, it was Forney." 788 S.W.2d at 886.

We hold that the court of appeals erred in concluding that the effective date of the final MIPA order is unconstitutionally retroactive because, after September 9, 1985, Pend Oreille was no longer receiving a supplementary allowable. The court arrived at this erroneous conclusion by treating allowables as if they are vested property rights. Operators do not have a vested property right in assigned monthly allowables. *Railroad Comm'n v. Aluminum Co. of Am.*, 380 S.W.2d 599, 602 (Tex.1964); *Chenoweth v. Railroad Comm'n*, 184 S.W.2d 711, 715 (Tex.Civ.App.—Austin 1944, writ ref'd w.o.m.); *F.A. Gillespie & Sons Co. v. Railroad Comm'n*, 161 S.W.2d 159, 162 (Tex.Civ.App.—Austin 1942, writ ref'd w.o.m.). Pend Oreille was not entitled to the supplementary allowable as a matter of right. Because allowables are not vested property rights, the final pooling order is not necessarily unconstitutional, unless some other vested right was interfered with by the September 9, 1985, final order.

The parties agree that Pend Oreille has a vested property right in its fair share of the production from the Bennett Well. *See, e.g., Stephens County v. Mid–Kansas Oil & Gas Co.*, 113 Tex. 160, 167, 254 S.W.

290, 292 (1923). Although Pend Oreille has a vested property right in its fair share of the oil and gas in place under its lease in the Bennett Gas Unit, this right is subject to state regulation. *See, e.g., Brown v. Humble Oil & Gas Ref. Co.*, 126 Tex. 296, 309–10, 83 S.W.2d 935, 942 (1935). The legislature, pursuant to its police power, may enact laws that promote conservation of this State's oil and gas reserves by preventing waste and protecting correlative rights. *Id.* The legislature may delegate this authority to the Railroad Commission. *Id.* at 301, 83 S.W.2d at 938. However, the commission may not exercise the powers delegated to it in an unreasonable, arbitrary or oppressive manner. *See id.* at 311, 83 S.W.2d at 943.

In this case, the commission exercised its delegated authority by issuing the MIPA interim order to protect the correlative rights of both Pend Oreille and Forney. If the effectiveness of the interim order was abrogated by the entry of the final order in the productive acreage hearings and, as a consequence, arbitrarily took from Pend Oreille its fair share of the production already produced (or the proceeds therefrom), then the final MIPA order relating back to the interim order is, arguably, unconstitutional.

We do not reach this question, however, because we hold that Pend Oreille is estopped to complain about the retroactive effective date of the final MIPA order. The interim order expressly stated that a final MIPA order would supersede it. The parties were on notice that the commission was contemplating the entry of a pooling order and that the date of the final order would be made effective to the date of the interim order. All the parties understood this and agreed to it, at least initially.

Notwithstanding the reasonable expectations of the parties and the commission order, Pend Oreille unilaterally stopped paying production proceeds into escrow. Pend Oreille says it did so because the interim order no longer was operative once the final order was entered in the productive acreage hearings. It does not follow,

however, that an order in another docket that conflicts with the escrow provisions of an interim order somehow makes the interim order a nullity. The interim order was still enforceable.

By its own terms, the interim order could not have been superseded except by the entry of a final judgment in that same proceeding. It follows that the commission intended this order to remain in effect pending its final determination. A final order in a different proceeding could not abrogate it, unless the interim order said so. *But cf. Big Three Indus., Inc. v. Railroad Comm'n*, 618 S.W.2d 543, 548 (Tex. 1981) (final order entered by Railroad Commission in one docket rendered order in separate commission docket likewise final).

The commission in this case clearly expected that Pend Oreille would continue to escrow some production proceeds throughout the entire interim period. The commission entered the interim order to protect both Pend Oreille's *and* Forney's correlative rights. Pend Oreille stopped paying the proceeds of production into escrow because it thought its vested rights were being impaired. But, the escrow provision of the commission's interim order was designed to protect Forney's rights as well as Pend Oreille's. Pend Oreille could, and should, have applied for a modification of the interim order. *See* Tex.R.R.Comm'n, 16 Tex.Admin.Code § 1.77 (West Sept. 1, 1988).

The court of appeals placed the burden of obtaining a modification upon Forney, because it was the party seeking relief. 788 S.W.2d at 886. But, it is unreasonable to place the burden on Forney to determine whether a well operator is unilaterally disregarding a commission order and then seek a modification. The burden to obtain a modification should have been placed on Pend Oreille because it was in the better position to know whether its vested rights might be interfered with, and could have taken action accordingly. Normally, it is the well operator who has the responsibili-

ty for providing to the commission that information which is necessary to determine and protect allocation of well allowables within a field. *See* 16 Tex.Admin.Code § 3.31 (Gas Well Allowables). We conclude that Pend Oreille had the duty to obtain any modification of the interim order necessary to protect any vested rights that might have been interfered with by the entry of the final order in the productive acreage hearing. To the extent that there is any interference, Pend Oreille will not be heard to complain, because it could have sought a modification. We hold that the Railroad Commission's final order in the MIPA proceeding is proper and may have an effective date earlier than the date of the entry of the final judgment in that docket.

Therefore, in conclusion, we affirm the court of appeals' judgment in part and reverse in part.

Concurring opinion by MAUZY, J.

MAUZY, Justice, concurring.

I concur in all parts of the majority opinion. I write separately, however, to point out the underlying principles which, in my view, mandate the result the majority reaches.

The controlling principles emerge from this state's past experiences in oil and gas regulation generally, and in the matter of pooling specifically. In the early years of the Texas oil and gas industry, independent producers and small-tract owners saw no need for forced pooling. The policies of the Railroad Commission assured the small tract owner or lessee both a drilling permit and a "living allowable"—that is, an allowable that was sufficient to make the tract economically viable. *See* 3 Smith & Weaver, *Texas Law of Oil and Gas* § 12.1, at 5 (1990).[1]

A 1961 decision of this court, however, effectively nullified the Railroad Commission's authority to protect the small producer. In *Atlantic Refining Co. v. Railroad*

---

1. Those policies included a liberal Rule 37 exception process for obtaining well permits on small tracts, along with large per-well allowable factors in the prorationing formulas for fields with small tracts. *Id.*

*Commission of Texas,* 162 Tex. 274, 346 S.W.2d 801 (1961) (the *Normanna* case), we invalidated certain prorationing formulas that the commission had long used to provide small producers with living allowables. We issued a similar opinion the next year, again favoring large owners over small. *Halbouty v. Railroad Commission of Texas,* 163 Tex. 417, 357 S.W.2d 364 (1962) (the *Port Acres* decision).

The Texas legislature responded in 1965 by enacting the Mineral Interest Pooling Act (MIPA), now codified at Tex.Nat.Res. Code Ann. §§ 102.001–.112 (Vernon 1978). As this Court has recognized, "the intention of the Legislature in enacting [MIPA] was to save the owners and lessees of small tracts from the devastating effects of [the *Normanna* and *Port Acres*] decisions." *Railroad Commission v. Coleman,* 460 S.W.2d 404, 407 (Tex.1970).

The history of MIPA suggests two general principles to apply in construing the act. First, MIPA should be construed to favor small-tract owners or lessees. *See* 3 Smith & Weaver § 12.1, at 7, § 12.3, at 33–1. Second, courts should allow the Railroad Commission broad authority under MIPA to accomplish the act's aims. The act was created to counter the restrictions which this Court placed upon the commission; and as the majority notes, on occasions when courts have sought to restrict the commission's authority under MIPA, the legislature has countered swiftly by restoring that authority.[2]

In the present case, the lessee of a relatively small tract seeks forced pooling under MIPA. Viewing the given facts, and giving due deference to the Railroad Commission, the majority upholds the commission's finding that the MIPA applicant made a fair and reasonable offer to pool voluntarily. The majority then upholds the commission's application of the term "common reservoir" to the facts of this case. Finally, the majority places the burden of modifying an interim MIPA order upon the

well operator, who in this case acted in disregard of a commission order. All three holdings are consistent with the history and intent of MIPA: they work in favor of the small-tract lessee, and they reflect the Railroad Commission's considerable latitude in construing and applying the act. For those reasons, I concur.

---

2. *See* ch. 300, §§ 1–2, 1979 Tex.Gen.Laws 673–75 (enacted in response to *Gage v. Railroad Commission,* 582 S.W.2d 410, 413 (Tex.1979) and *Railroad Commission v. Graford Oil Corp.,* 557 S.W.2d 946 (Tex.1977)); ch. 688, 1981 Tex. Gen.Laws 2578–80 (enacted to address the issue presented in *Railroad Commission v. Mote Resources,* 645 S.W.2d 639 (Tex.App.—Austin 1983, no writ)).