# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
NO. 03-11-00512-CV
---

**Christopher Zaal, Appellant**

**v.**

**Texas Department of Insurance, Appellee**

---
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
NO. D-1-GN-10-003682, HONORABLE GISELA D. TRIANA, JUDGE PRESIDING**
---

## M E M O R A N D U M  O P I N I O N

Christopher Anthony Zaal appeals from a district court judgment affirming a final order of the Texas Insurance Commissioner revoking his insurance license. We will affirm the district court's judgment.

## BACKGROUND

Christopher Anthony Zaal has held a General Life, Health, and Accident license since 1986. Zaal has no previous complaints against him, and he has no criminal history.

On May 7, 2009, the Texas Department of Insurance (TDI) notified Zaal of a public hearing alleging that he engaged in dishonest or fraudulent acts or practices with respect to his sale of universal leases and with regard to annuity applications for his clients. The Commissioner has the authority to revoke an agent's license if the licensee engages in "fraudulent . . . acts or practices." Tex. Ins. Code §§ 4005.101(b)(5), .102.

Following the hearing, the Administrative Law Judge (ALJ) issued a Proposal for Decision finding that Zaal engaged in dishonest acts or practices with regard to the Robert Weyman and Edwin Winn annuities and that he engaged in fraudulent acts or practices with regard to his sales of universal leases. *Id.* § 4005.101(b)(5). The ALJ recommended that Zaal's license be revoked. The Commissioner of Insurance adopted the ALJ's findings of fact and conclusions of law and ordered Zaal's license revoked. Zaal filed a petition for judicial review; the district court affirmed the Commissioner's order. Zaal appeals. We will affirm the judgment.

## ISSUES ON APPEAL

In two issues, Zaal asserts that we must reverse the district court's judgment because the TDI (1) failed to prove that he committed fraud in connection with the sale of universal leases and (2) failed to prove that he engaged in dishonest or fraudulent conduct in connection with his clients' annuity applications or that his clients sustained any damages. We construe these issues as complaints that the Commissioner's order is not supported by substantial evidence. Zaal has the burden to demonstrate that the record lacks substantial evidence.

## STANDARD OF REVIEW

Review of the Commisioner's order is governed by section 2001.174 of the Administrative Procedures Act (APA), which provides:

> A court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion, but:
>
> (1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174; *see* Tex. Ins. Code § 36.203; *Meyer v. Texas Dep't of Ins.*, No. 03-10-00642-CV, 2011 WL 5865240, at *10 (Tex. App.—Austin Nov. 23, 2011, pet. denied) (mem. op.).

"Substantial evidence," as used in 2(E) above, is "a reasonableness test or a rational basis test." *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1993) (citing *Railroad Comm'n v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 41 (Tex. 1991)). Although substantial evidence is more than a mere scintilla, the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence. *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984). We consider not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Id.* We may not substitute our judgment as to the weight of the evidence for that of the agency. *City of El Paso*, 883 S.W.2d at 185. The

findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Charter Medical*, 665 S.W.2d at 453.[1]

---

[1] Among others, the Commissioner made the following findings:

18.    Mr. Weyman had no other communication with [Zaal] or his staff about the annuity product and did not authorize its purchase.

19.    Mr. Weyman did not authorize [Zaal] or his staff to scan Mr. Weyman's signature onto the annuity purchase documents.

20.    The signature on the annuity purchase documents was not Mr. Weyman's.

21.    [Zaal's] written explanation to AILIC, in response to Mr. Weyman's complaint, was not accurate.

30.    Mr. Winn replied to Great American that he had not signed the application or original form and that they contained a false signature.

31.    Mr. Winn did not authorize the purchase of the annuity product or the withdrawal amount.

32.    Mr. Winn did not authorize [Zaal] or his staff to electronically scan his signature onto the annuity purchase documents.

34.    The signature on the annuity purchase documents was not Mr. Winn's.

36.    [Zaal] prepared and submitted false documents in applying for the annuity in Mr. Winn's name.

74.    [Zaal's] only meeting with Majesty Travel's directors was limited and superficial.

75.    [Zaal] relied on the assertion that Majesty Travel was independent and the fact that it had been selected by Resort Holdings.

76.    [Zaal] did virtually no investigation of Majesty Travel or World Phantasy Tours.

## DISCUSSION

**Weyman and Winn Annuities**

TDI determined that Zaal engaged in dishonest acts or practices with respect to the annuity transactions involving his clients Robert Weyman and Edwin Winn, and it asserts on appeal that the record contains substantial evidence to support the ruling. Zaal argues that the unauthorized annuity transactions in issue were merely honest mistakes made by another person in his office. Zaal also asserts that the record contains no evidence of his dishonest conduct, and that the record is uncontroverted that he did not authorize the changes to his client's annuities.

Zaal notes that the term "dishonest" is not defined in the Insurance Code. The agency suggests that dishonest conduct may be given its ordinary dictionary definition as an act characterized by a lack of truth, honesty, or trustworthiness, and includes an act that is unfair or deceptive. Mirriam-Webster's Collegiate Dictionary 359 (2008); *see also Brown v. Texas Dep't of Ins.*, 34 S.W.3d 683, 689 (Tex. App.—Austin 2000, no pet.).

Robert Weyman, an assistant public school principal, was Zaal's client and had been making $500 regular withdrawals from his pay for some time. Zaal went to Weyman's office to discuss a new product, but it was not a convenient time for Weyman to confer. Weyman had no further communication with Zaal or his office about the matter. The next month, Zaal, or someone in his employ, submitted an application in Weyman's name to Annuity Investors Life Insurance Company, a subsidiary of Great American Financial Resources, to obtain for Weyman a Flex Max

---

94.     [Zaal] materially misled clients concerning the quality and safety of the universal lease product without knowledge of the truth of his representations.

5

annuity product that would increase Weyman's withdrawal to $1000 a month. The application and disclosure notice purported to be signed by Weyman, but the signatures were not his. Zaal's signature appeared on the documents as the agent. Weyman testified that he did not authorize the purchase, and he did not authorize Zaal or his staff to scan his signature onto the documents.

When Weyman discovered the increase, he stopped payment and did not lose money on the transaction. Nevertheless, he filed a complaint with Annuity Investors, which questioned Zaal about the transaction. Zaal's written explanation to the insurance company claimed that he was authorized and directed by Weyman to expedite the transaction, and that he had acted with his client's full knowledge and approval. This explanation conflicted with his position at the hearing and on appeal, where he claims that the application must be an honest mistake by someone in his office. Weyman testified that Zaal's claims were untrue, and that Weyman never authorized or knew of the transaction.

Edwin Winn, an air conditioner mechanic for a school district, was another of Zaal's clients. Winn had set up an annuity purchase with Zaal years before, in which he had $60 withdrawn biweekly from his pay. Zaal, or someone in his employ, submitted an application in Winn's name to obtain a Commodore Distinction II annuity with a biweekly withdrawal of $700. The application and disclosure notice purport to be signed by Winn, and Zaal's signature appear on the application documents as agent.

Great American Financial Resources wrote Winn a letter, requesting him to submit the required form to his payroll office. Winn responded that he had not signed the application or original form and asserted that the documents contained false signatures. Winn filed a complaint.

Zaal claimed to the company that Winn had agreed to purchase the annuity. His explanation in his response to Great American was not accurate. Winn did not authorize Zaal or his staff to scan his signature onto the purchase documents. He had never heard of this type of annuity, and he did not authorize the purchase of the annuity or the withdrawal of $700. Zaal asserted at the hearing and on appeal that the unauthorized annuity applications were honest mistakes made by a former colleague, Henrek Rotem, but the evidence from this witness and others disputes Zaal's claims.

Rotem, who had worked with Zaal, described the office system whereby files were controlled by and processed only at the direction of the agent who had obtained the client's consent. Rotem stated that he would only process a purchase request after getting the customer's consent, after which he would deliver the file to the agent for final processing. He testified that he never switched a client's investment from one product to another and never increased the amount of the investment without permission.

The TDI found that Zaal prepared and submitted false documents in applying for the annuity in Weyman's name and in applying for the annuity in Winn's name.

**Universal Leases**

During 2000-2004, Zaal was president of Z&Z International.[2] Zaal sold various financial products, including universal leases. Zaal sold about thirteen universal leases between 2000 and 2003, and he also purchased one for himself.

Zaal offered the universal lease as an agent of Yucatan Resorts, S.A. de C.V. (Yucatan Resorts), a company located in Cancun, Mexico. Yucatan Resorts was also known as

---

[2] Zaal is now a consultant for Z & Z International.

Resort Holdings International (Resort Holdings). These and other entities were owned by Michael Kelly. The universal lease entitled the purchaser to vacation accommodations in one of Yucatan Resorts' properties in Cancun, Mexico, for a specific unit for a specific week and term, similar to a timeshare interest in a resort. Zaal received a sixteen percent commission for the sale of each universal lease.

Owners of a universal lease had three options. They could use their unit themselves, rent it themselves, or employ a third-party independent management company to rent and manage their unit. Zaal's clients elected the third option. Owners could choose their own third-party management company, but Zaal referred his clients to Majesty Travel, later known as World Phantasy Tours. These companies were represented to be third-party independent companies recommended by Resort Holdings, but they were in fact owned by Michael Kelly. Kelly is now in federal prison.[3]

The appeal of a universal lease was the high rate of return on the investment. Zaal promoted universal leases to his clients, including Charles Winkle, Charles Johnson, and Joan Johnson, a retired school teacher, as a safe and secure long-term investment that would realize high returns each year. He did not caution them to diversify their investments to secure their retirement funds. He promoted the lease as a retirement investment that would be safer than regulated investments such as stocks and mutual funds, and that the clients would receive generous

---

[3] This Court previously affirmed a case based on similar facts in which an insurance agent's license was revoked for selling universal leases for these same entities. *See Meyer v. Texas Dep't of Ins.*, No. 03-10-00642-CV, 2011 WL 5865240 (Tex. App.—Austin Nov. 23, 2011, pet. denied) (mem. op.).

returns on the lease for years. None of these clients have received the returns promised and all have lost their investment funds.

In order to promote the universal lease as a safe and secure investment, Zaal was obligated to perform sufficient investigation of Resort Holdings, the universal lease program and the properties, as well as the management companies and the agreement to pay fixed rates of return on the investment. The record shows that Zaal adequately investigated Resort Holdings, but he did not adequately investigate the universal lease, and he did not investigate Majesty Travel or World Phantasy Tours. He relied on Resort Holdings' representations concerning the universal lease and its representation that Majesty Travel was an independent company, and on the fact that it had been selected by Resort Holdings. He admits that he relied on Resort Holdings' investigation and recommendation of the third-party management company and on its representations concerning the third-party company, and he told his clients that Resort Holdings recommended Majesty Travel. When questioned by regulators in 2004, Zaal said that he had never met anyone from Majesty Travel. At the hearing in 2009, he claimed that he had met with the company's directors, but he also admitted that the meeting was merely a brief greeting.

The third-party management company, not Resort Holdings, was responsible for payment of the compensation to the leaseholders. Majesty Travel and World Phantasy agreed to pay the owner either nine or eleven percent of the purchase price of the unit each year. Five percent was for an option allowing World Phantasy or Majesty Travel to repurchase the unit after 36 months, although they had no obligation to do so; four or six percent was for rental compensation.

Zaal did not tell his clients anything different from the written material in the lease and promotional documents. The promotional materials promised an "attractive, high rate of return" and "long-term assurance" up to twenty-five years. He did not mislead his clients about their right to redeem their investment. He told his clients that Resort Holdings had a right of first refusal but was not required to buy back the lease. However, he led his clients to believe that the investment was secure despite inadequate knowledge.

Zaal's belief that the universal lease was not a security was unfounded and was based in part upon a law firm's representation that "[the universal lease] will more likely than not be found to not constitute the sale of a security." This questionable assertion did not raise Zaal's concerns. A lawyers's 2001 letter to that effect was based on the assumption that the promotion and marketing of the lease did not emphasize the economic benefits to be derived from the efforts of a third-party leasing agent. However, Zaal's marketing efforts did in fact emphasize the economic benefits to be derived from the third-party management agent. The manner in which Zaal was marketing the universal lease program was different from the facts described by the lawyer.

In response to learning about a website raising securities concerns about the product, Zaal undertook no independent investigation. He reviewed the attorney's second letter which again concluded that the universal lease was not a security based on the assumption that the promotion and marketing efforts did not emphasize the economic benefits derived from a third-party leasing agent, which was not the case with Zaal.

Zaal was not aware of the cease and desist orders against Kelly issued in several states to stop the sale of one of Kelly's previous investment vehicles, known as the promissory note

10

program, for failure to register them as securities. Zaal did not attempt to find out what states were investigating the universal lease as unregistered securities. He relied on Resort Holdings' assurances. TDI found that Zaal should have investigated the securities concerns before continuing to sell the universal lease product, and he should have informed purchasers of the securities issue.

Zaal did not inform his clients of any securities issues. He relied on a letter from Resort Holdings to the leaseholders alleging that a disgruntled employee was attempting to smear its reputation. However, the letter made no mention of the securities concerns.

The record contains information concerning several of Zaal's clients who purchased universal leases. One of Zaal's clients, Joan Johnson, bought a universal lease in December 2000; she bought a second lease eight months later, using the maximum available lump sum from her teacher retirement account. Her husband, Charles Johnson, bought a lease in February 2002, then purchased a second lease seven months later. Zaal did not inform either of the Johnsons of any potential securities problems or any other problems regarding the investment, either before or between purchases. Neither would have bought a universal lease had they known of potential securities issues. Charles Winkle also testified about his dealings with Zaal in purchasing a universal lease.

Universal lease owners received statements from Majesty Travel or World Phantasy reflecting the accumulated value of their universal lease accounts. In fact, any values were being funded by new investors. In 2006, the universal leaseholders received statements reflecting that their investments were worthless.

The Commissioner's findings of fact and conclusions of law set out in his order explain the Commissioner's decision-making process and the result he reached. *See State Banking Board v Allied Bank Marble Falls*, 748 S.W.2d 447, 449 (Tex. 1988).

The Commissioner determined that Zaal materially misled his clients concerning the quality and safety of the universal lease product investment, without knowledge of the truth of his representations. The Commissioner measured Zaal's actions against the accepted definition of fraud: a material misrepresentation, which was false, and which was asserted as a positive assertion without knowledge of its truth, which was intended to be acted on, which was relied on, and which caused injury. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *Brown*, 34 S.W.3d at 689. The Commissioner found that Zaal engaged in fraudulent acts or practices, in violation of Texas Insurance Code section 4005.101(b)(5), with regard to his sale of universal leases. Substantial evidence in the record supports this finding.

## CONCLUSION

We hold that the record contains substantial evidence to support the Commissioner's decision revoking Zaal's license. We overrule Zaal's issues and affirm the district court's judgment.

_____

Marilyn Aboussie, Justice

Before Justices Goodwin, Field, and Aboussie*

Affirmed

Filed:  October 29, 2013

*Before Marilyn Aboussie, Chief Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b)