# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-12-00801-CV

**Robertson County:  Our Land, Our Lives (RCOLOL); and Roy Henrichson, Appellants**

**v.**

**Texas Commission on Environmental Quality and
Oak Grove Management Company, LLC, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
### NO. D-1-GN-10-003925, HONORABLE TIM SULAK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

We withdraw our opinion and judgment dated June 6, 2014, and substitute the following in their place.  We deny the motion for rehearing filed by appellant, Robertson County: Our Land, Our Lives.

This is an administrative appeal challenging a Texas Commission on Environmental Quality (TCEQ) final order granting a permit amendment to appellee Oak Grove Management Company, LLC.  For reasons we explain below, we will affirm the district court's judgment and TCEQ's decision.

## BACKGROUND

Oak Grove Management Company operates the Oak Grove Steam Electric Station in Robertson County, Texas.  As its name suggests, Oak Grove Steam Electric Station (OGSES)

is a facility that generates electricity by producing steam to drive a turbine, which in turn powers an electric generator. The steam is generated from water heated by the combustion of lignite. Oak Grove operates OGSES under various environmental permits, including a permit from TCEQ to dispose of wastewater created as a byproduct of the electricity-generation process. In 2007, Oak Grove submitted an application to TCEQ to renew and amend OGSES's wastewater discharge permit to allow it to change the outfall[1] location and volume of its wastewater discharge.[2] This permit application and the resulting administrative process gave rise to this appeal. Two specific categories of OGSES's wastewater are relevant to our disposition of appellants' issues and, thus, merit further explanation.

**OGSES wastewater**

The first category of wastewater is a byproduct of OGSES's steam-generating process. After the steam produced by the boiler has passed through the turbines, it is condensed into water and recycled to the boilers to make more steam. That cooling is accomplished using a condenser and large quantities of cool water drawn from the adjacent Twin Oak Reservoir, which is a privately owned "industrial cooling impoundment" specifically constructed to provide cooling

---

[1] An "outfall" is the "point or location where waterborne waste is discharged" into or near water. *See* 30 Tex. Admin. Code § 305.2(25) (TCEQ, Definitions) (defining "outfall" in context of consolidated permits).

[2] OGSES has been permitted to discharge wastewater since 1976. Its first wastewater-discharge permit was issued by the State of Texas. Then, following the enactment of the National Pollutant Discharge Elimination System program (NPDES) in the Clean Water Act, OGSES obtained a federal wastewater permit from the EPA in 1983. *See* 33 U.S.C. §§ 1251 et seq. (CWA); *id.* at § 1342 (NPDES). After 1998, when the EPA transferred NPDES permitting authority to the state, OGSES's permit was issued by TCEQ. For convenience, we will refer to this permit as OGSES's "original" permit.

water to OGSES.[3]  Billions of gallons of cool water are continuously pulled from the reservoir, treated with small amounts of chlorine and dispersant/scale inhibitor, and then pumped into a network of tubes running through the condenser where the "used" steam is collected.  The cooling water, which does not come into direct contact with the steam, absorbs the steam's heat through the pipes, condensing the steam into water to be reused in the boilers.  The then-warmer reservoir water, called "once-through cooling water,"[4] is discharged first into the "Primary Discharge Canal" and then ultimately into the reservoir through "external Outfall 001."

The second type of wastewater, also a byproduct of the steam-generation process, is created in connection with the lignite fuel, used to run the two steam boilers, that is stored on OGSES's grounds.  Storm water that comes into contact with the stored lignite is collected in a lined storage pond—the "Lignite Retention Pond"—designed to hold the amount of storm water that would run off from approximately 87 acres following a 10-year, 24-hour storm event.  Ultimately, some of the wastewater stored in the lignite retention pond is, like the cooling water described above, discharged into the adjacent Twin Oak Reservoir.  Under OGSES's original permit, however, the discharge from the lignite retention pond flowed into a drainage ditch and then into the reservoir through "external Outfall 002."

---

[3]  *See* 30 Tex. Admin. Code § 307.3(31) (TCEQ, Texas Surface Water Quality Standards) (defining "industrial cooling impoundment").  As will be discussed in more detail below, the Twin Oak Reservoir is periodically refilled with water drawn from the nearby Lake Limestone.  This "make-up" water is pumped from Lake Limestone and transported to Twin Oak Reservoir through an eleven-mile pipeline.

[4]  *See id*. § 210.52(15) (TCEQ, Definitions) (in context of industrial reclaimed water, defining "once-through cooling water" as "water passed through main cooling condensers in one or two passes for the purpose of removing waste heat").

**2007 permit application**

In its 2007 permit application to TCEQ, Oak Grove sought one administrative and one technical change to OGSES's original permit. Administratively, Oak Grove sought to renumber OGSES's permitted outfalls and reroute certain already-permitted wastewater streams without changing the overall quality or quantity of the discharge. Under the original permit, each wastewater stream from the facility had its own designated outfall, but all streams ultimately discharged into the Twin Oak Reservoir. Under the requested modifications, most of OGSES's wastewater streams, including the once-through cooling water and, intermittently, some of the coal-pile runoff,[5] would discharge into the Primary Discharge Canal and then into the Twin Oak Reservoir at Outfall 001. The coal-pile runoff that did not discharge at external Outfall 001, would continue to discharge into the reservoir at Outfall 002, as it did under OGSES's original permit.[6]

Technically, Oak Grove sought to increase the allowable maximum daily volume of effluent discharged at Outfall 001 from 1.47 billion to 1.61 billion gallons per day. According to Oak Grove, this volume change was necessary to correct for the fact that the prior discharge limit

---

[5] According to TCEQ's order, the new permit authorized an additional internal outfall to discharge coal-pile runoff from the lignite storage area to the discharge canal and then, ultimately, to the reservoir through Outfall 001: "Pursuant to the amendment application, Oak Grove seeks a new outfall, Outfall 201, discharging in the Primary Discharge Canal from the Lignite Retention Pond in lieu of or in addition to using Outfall 002."

[6] Under the original permit, Oak Grove was authorized to discharge "coal pile runoff and storm water from the lignite/limestone storage area." (Footnotes omitted.) The new permit authorizes discharge of "coal pile runoff, low volume waste, and storm water from the lignite/limestone storage area." (Footnotes omitted.) RCOLOL argues in its motion for rehearing that the addition of low-volume waste to the permit is a significant change in the permitted discharge. We disagree. Both the original and new permit describe the discharge as coming from the same source—i.e., the "lignite/limestone storage area"—and the new permit retains the identical effluent limitations specified in the original permit).

4

was based on the rated capacity of the facility's cooling-water intake structure (sometimes "CWIS") pumps rather than on the pumps' actual capacity, and to account for the permit changes allowing other wastewater streams to be rerouted to Outfall 001.

**Administrative proceedings**

TCEQ's executive director reviewed the technical merits of Oak Grove's application, concluded that the application met the requirements of applicable laws and regulations, and issued a draft permit for publication and comment. The EPA, after reviewing the application and draft permit, suggested changes for documenting the operating conditions of the CWIS. Those changes were subsequently incorporated into a revised draft permit that was again approved by TCEQ's executive director and published for public comment. Thereafter, Oak Grove asked for and was granted a contested-case hearing on the merits of its application. Appellees Robertson County: Our Land, Our Lives (self-denominated as "RCOLOL") and one of its members, Roy Henrichson, were admitted as parties to the contested-case hearing.[7] TCEQ's commissioners, after reviewing the ALJ's proposal for decision, the evidence in the record, and the pleadings and arguments of the parties, adopted a final order approving the amended permit.

After exhausting their administrative remedies, RCOLOL and Henrichson (collectively, "RCOLOL") filed suit in Travis County District Court, seeking judicial review of TCEQ's order granting Oak Grove's permit modification. Ultimately, after briefing by the parties and a trial on the merits, the district court affirmed TCEQ's order. It is from this final judgment that RCOLOL now appeals.

---

[7] RCOLOL describes itself as "a membership organization made up of landowners and citizens in Robertson County."

**DISCUSSION**

RCOLOL challenges TCEQ's order in four issues. The first two raise questions regarding the modified permit's regulation of cooling-water intake structures: (1) whether TCEQ should have classified as a CWIS the structure on Lake Limestone used to pump water into the Twin Oak Reservoir; and (2) whether the modified permit sufficiently establishes binding legal obligations related to OGSES's operation and maintenance of its CWIS. RCOLOL's third and fourth issues address matters related to TCEQ's antidegradation regulations:[8] (3) whether TCEQ utilized the proper baseline water-quality conditions in applying the antidegradation regulations; and (4) whether TCEQ reasonably concluded that the permit modifications would result in less than de minimis lowering of the Twin Oak Reservoir's water quality.

**Standard of review**

The parties agree that our review of TCEQ's order is governed by APA section 2001.174. This standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are:

(A)     in violation of a constitutional or statutory provision;

(B)     in excess of the agency's statutory authority;

(C)     made through unlawful procedure;

(D)     affected by other error of law;

---

[8] As will be discussed in more detail below, antidegradation rules seek to protect and maintain surface water that already meets or exceeds water-quality levels.

(E)     not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F)     arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[9]

However, we may not substitute our judgment for that of the agency's on the weight of the evidence on matters committed to agency discretion.[10]  With respect to subparagraph (E), "substantial evidence" does not mean a large or considerable amount of evidence, but such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact.[11]  The test is not whether the agency made the correct conclusion in our view, but whether some reasonable basis exists in the record for the agency's action.[12]  We must uphold an agency's finding even if the evidence actually preponderates against it, so long as enough evidence suggests the agency's determination was within the bounds of reasonableness.[13]

**Cooling-water intake structures**

Because RCOLOL's first two issues question whether TCEQ properly construed the applicable rules and regulations regarding cooling-water intake structures, we will begin with some background information on CWISs and the regulations that govern them.

---

[9]  Tex. Gov't Code § 2001.174(2).

[10]  *Id*. § 2001.174; *Southwestern Pub. Serv. Co. v. Public Util. Comm'n of Tex.*, 962 S.W.2d 207, 215 (Tex. App.—Austin 1998, pet. denied).

[11]  *Pierce v. Underwood*, 487 U.S. 552, 564–65 (1988); *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ).

[12]  *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Railroad Comm'n v. Pend Oreille Oil & Gas Co., Inc.*, 817 S.W.2d 36, 41 (Tex. 1991).

[13]  *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215.

As the name suggests, "cooling-water intake structures" are structures used by a power plant or manufacturing facility to draw water from a lake or river for cooling purposes. Because of the large amounts of water that may be drawn and the possibility of adverse environmental impact, the Clean Water Act requires that "the location, design, construction, and capacity of" these structures "reflect the best technology available for minimizing adverse environmental impact."[14] The EPA has, in turn, promulgated rules to implement this provision in three phases: "Phase I" rules, which address new, large cooling-water intake structures;[15] "Phase II" rules, which address existing, large cooling-water intake structures;[16] and "Phase III" rules, which address new, offshore oil and gas extraction facilities.[17]

As an "existing" facility,[18] the OGSES plant would be subject to the EPA's Phase II rules, but the EPA suspended most of the Phase II rules after the Second Circuit remanded key provisions of those rules to the agency for reconsideration and additional explanation.[19]

---

[14] 33 U.S.C. § 1326(b).

[15] *See* National Pollutant Discharge Elimination System: Regulations Addressing Cooling Water Intake Structures for New Facilities, 66 Fed. Reg. 65256-01 (Dec. 18, 2001).

[16] *See* National Pollutant Discharge Elimination System—Final Regulations to Establish Requirements for Cooling Water Intake Structures at Phase II Existing Facilities, 69 Fed. Reg. 41576 (July 9, 2004).

[17] *See* National Pollutant Discharge Elimination System—Final Regulations To Establish Requirements for Cooling Water Intake Structures at Phase III Facilities, 71 Fed. Reg. 35006-01 (June 16, 2006).

[18] *See* 69 Fed. Reg. 41576. Although RCOLOL argued below that OGSES was a new facility subject to Phase I rules, TCEQ found that it was an existing facility and declined to apply those rules, and RCOLOL has not challenged this finding on appeal.

[19] *See Riverkeeper, Inc. v. United States Envtl. Prot. Agency*, 475 F.3d 83, 130–31 (2d Cir. 2007) *reversed and remanded by Entergy Corp. v. Riverkeeper, Inc.*, 506 U.S. 208 (2009).

Accordingly, and because the EPA has yet to adopt new rules, existing large cooling-water intake structures like OGSES's are evaluated on a case-by-case basis using best professional judgment.[20] This is the standard that TCEQ applied to the OGSES structure on Twin Oak Reservoir.

### Lake Limestone pump station

The parties agree that the OGSES structure used to draw water from the Twin Oak Reservoir is a cooling-water intake structure subject to CWIS regulations. In its first issue on appeal, RCOLOL argues that TCEQ should have also deemed as a CWIS, and thus analyzed and regulated in the modified permit, the water-transfer pump station on Lake Limestone that is used to pump water to resupply Twin Oak Reservoir. We disagree.

Lake Limestone is a water-supply reservoir built by the Brazos River Authority that is approximately eleven miles northeast of Twin Oak Reservoir. Oak Grove has a permit from the Texas Water Rights Commission to pump water from Lake Limestone to make up for evaporative water losses and downstream discharges from the Twin Oak Reservoir. This replenishment is accomplished using a diversion structure on Lake Limestone to pump water from that lake to the reservoir through an eleven-mile pipeline. The Lake Limestone structure and the pipeline are not physically connected to the OGSES facility. And the water transfer from Lake Limestone to the reservoir occurs regardless of whether the OGSES plant is operating.

RCOLOL argues that because the OGSES facility ultimately relies on the water transferred from Lake Limestone to supply the cooling water for its cooling-water intake

---

[20] *See* National Pollutant Discharge Elimination System—Suspension of Regulations Establishing Requirements for Cooling Water Intake Structures at Phase II Existing Facilities, 72 Fed. Reg. 37107-01 (July 9, 2007) (suspending Phase II rules and providing that "[p]ermit requirements for cooling water intake structures at Phase II facilities should be established on a case-by-case best professional judgment (BPJ) basis").

9

structure, the water drawn from Lake Limestone is cooling water and, thus, the pump station on Lake Limestone is likewise a cooling-water intake structure subject to EPA regulations. RCOLOL relies on the following EPA definitions found in its Phase I rules for new facilities:

> Cooling water means water used for contact or noncontact cooling, including water used for equipment cooling, evaporative cooling tower makeup, and dilution of effluent heat content. The intended use of the cooling water is to absorb waste heat rejected from the process or processes used, or from auxiliary operations on the facility's premises. Cooling water that is used in a manufacturing process either before or after it is used for cooling is considered process water for the purposes of calculating the percentage of a new facility's intake flow that is used for cooling purposes in § 125.81(c).
>
> Cooling water intake structure means the total physical structure and any associated constructed waterways used to withdraw cooling water from waters of the U.S. The cooling water intake structure extends from the point at which water is withdrawn from the surface water source up to, and including, the intake pumps.[21]

Even if we disregard that Phase I rules do not apply to existing facilities such as OGSES,[22] the administrative record here reasonably supports the conclusion that the water pumped from Lake Limestone is not cooling water and, thus, TCEQ's decision to not analyze or regulate the Lake Limestone pump in connection with the permit at issue here.

The EPA description of the scope of a cooling-water intake structure makes it clear that whether water is cooling water or something else is determined by its intended purpose at the time it is withdrawn from the surface water: "The cooling water intake structure extends from *the point at which water is withdrawn from the surface water source* up to, and including, the

---

[21] 40 C.F.R. § 125.83 (EPA, What special definitions apply to this subpart?).

[22] *See id.* § 125.80 (EPA, What are the purpose and scope of this subpart?) ("This subpart establishes requirements that apply to the location, design, construction, and capacity of cooling water intake structures at *new* facilities.") (emphasis added).

10

intake pumps."[23] The evidence in the administrative record shows that when it is withdrawn from Lake Limestone, the water's purpose is to make up for the loss of volume of the reservoir—i.e., the Lake Limestone structure uses the water it withdraws for make-up purposes.[24] The purpose of the water drawn from a CWIS, including OGSES's CWIS, on other hand, is to cool the steam at that plant—i.e., it uses the water it withdraws for cooling purposes.[25] And despite RCOLOL's contention the contrary, whether the make-up water drawn from Lake Limestone is later used as cooling water at OGSES does not change the fact that at the point it is withdrawn from Lake Limestone, that water is used as make-up water, not cooling water. In fact, given that Lake Limestone supplies Twin Oak Reservoir with the make-up water whether the OGSES plant is operating or not, it would not be unreasonable to conclude that it may never be used for cooling water.

RCOLOL suggests that in the context of EPA Phase I rules, "make-up water" and "cooling water" are synonymous: "the EPA has previously established that 'make-up water' is merely a type of 'cooling water' in the [Clean Water Act] § 316(b) context." In support of this argument, RCOLOL relies on comments to EPA rule 125.81.[26] But again ignoring that Phase I rules do not apply to existing CWIS facilities like OGSES's, the Phase I rules distinguish cooling water from make-up water: "A diagram of the facility's water balance would be used to identify the

_____

[23] *Id.* § 125.83 (defining scope of structure) (emphasis added).

[24] *See id.* §§ 125.81(a)(2) (describing CWIS in terms of a structure "that *uses* . . . the water it withdraws for cooling purposes"), 125.83 (defining cooling water as "water *used* for contact or noncontact cooling") (emphases added).

[25] *Id.* §§ 125.81, .83.

[26] *See* National Pollutant Discharge Elimination System: Regulations Addressing Cooling Water Intake Structures for New Facilities, 66 Fed. Reg. 65256-01, 65289 ("While reductions in total intake flow may represent the single most significant improvement for new facilities with cooling water intake structures, large flows withdrawn for make-up (i.e., to replace evaporative loss and blow down) can still cause significant impingement and entrainment.").

11

proportion of intake water used for cooling, make-up, and process water."[27] In fact, the Phase I rules only use the phrase "make-up water" when referring to a "closed-cycle recirculating system,"[28] and the evidence in the record shows that the OGSES structure is not this type of system; rather, it is, as discussed previously, a "once-through cooling water system." In a closed-cycle recirculating system, the only water that is added to the system for cooling purposes is make-up water to account for evaporative losses, drift, and blowdown from the cooling towers associated with the system. The make-up water is added directly to the closed system to maintain sufficient cooling water in the cooling system piping and equipment. That is not how "make-up water" is used at OGSES.

RCOLOL also argues that TCEQ's position here—i.e., that make-up water does not constitute cooling water—is inconsistent with a prior position it advanced before the EPA. Specifically, RCOLOL relies on the following language in an October 2009 letter from TCEQ to EPA that, RCOLOL maintains, is TCEQ's proposed a framework for regulating facilities such as OGSES:

> Where a facility is located on an industrial impoundment and the external facility intake design capacity is greater than or equal to 50 million gallons per day, the TCEQ proposes to regulate the external facility as the cooling water intake structure.

RCOLOL contends that this letter reflects a position that water drawn through external sources such as Lake Limestone is cooling water. But RCOLOL's argument here is not persuasive. First, TCEQ does not propose to regulate the Lake Limestone structure, as RCOLOL is asking it to do here,

---

[27] 66 Fed. Reg. at 65316.

[28] 40 C.F.R. § 125.83 (explaining that "new source water (make-up water) is added to the [closed-cycle recirculating] system to replenish losses that have occurred due to blowdown, drift, and evaporation").

because that facility's design capacity is less than 50 million gallons per day.[29]  Second, TCEQ's position did not seek, as RCOLOL's interpretation would have it do, to regulate two CWIS as part of a single facility, but only the external facility.  Third, EPA rejected this approach when TCEQ presented it.

We would also note that there is support in the record for a determination that the Lake Limestone pump is not part of the OGSES facility.  The EPA rule relating to new structures defines a cooling-water intake structure as "the total physical structure and any associated constructed waterways used to withdraw cooling water from waters of the U.S."[30]  The evidence shows that neither the pump nor the pipeline that transports the water to Twin Oak Reservoir are physically connected to the OGSES structure; in fact, they are eleven miles apart.  Nor can a pipeline be considered an "associated constructed waterway,"[31] given that a "waterway" is defined as "a body of water . . . flowing in a reasonably definite channel with bed and banks"[32] and that the EPA rules distinguish between "waterways" and "pipelines."[33]  Likewise, the EPA's description of the scope of a CWIS precludes inclusion of the pump at Lake Limestone:  "The cooling water intake structure extends from the point at which the water is withdrawn from the surface water source *up to, and*

---

[29] *See* 69 Fed. Reg. at 41577–78 (excluding from regulation under Clean Water Act section 316(b) those CWIS that withdraw less than 50 million gallons per day).

[30] *See id.* § 125.83.

[31] *Id.*

[32] *Black's Law Dictionary* 1825 (10th ed. 2014) (defining "watercourse" and "waterway" interchangeably); *see also id.* at 1825–26 ("The term includes not just rivers and creeks, but also springs, lakes, and marshes in which such flowing streams originate or through which they flow.").

[33] *See* 40 C.F.R. § 63.761 (EPA, Definitions) (in definition of "facility," distinguishing between connection by "waterway, power line or pipeline").

*including, the intake pumps*."[34] If the pump at Lake Limestone were to be considered a CWIS under this description, then the structure would end at the intake pump—i.e., before it reached Twin Oak Reservoir—meaning that it could not also be part of the Twin Oak Reservoir structure.

Because the record reasonably supports a determination that water drawn from Lake Limestone is not cooling water and that the pump at Lake Limestone is not part of the OGSES CWIS facility, TCEQ's failure to include a CWIS provision for Lake Limestone in OGSES's new permit was not an abuse of its discretion or arbitrary and capricious. Accordingly, we overrule RCOLOL's first issue.

### Adequacy of CWIS provisions

In its second CWIS-related argument, RCOLOL contends that the new permit "fails to contain adequately specific requirements related to the operation and maintenance of the OGSES cooling-water intake structures" and, as a result, its issuance was in violation of TCEQ rules, arbitrary and capricious, legally erroneous, made through unlawful procedure, and not supported by substantial evidence. We disagree.

The new permit issued to OGSES includes the following provision particular to the facility's cooling-water intake structure:

18. <u>COOLING WATER INTAKE STRUCTURE REQUIREMENTS: 316(b) of the CWA</u>

The permittee shall continue to operate and maintain the cooling water intake structure (CWIS) configuration consistent with the documents, titled *Supplemental Information for 316(b) Determination* and a *Cooling Water Intake Technology Evaluation for Oak Grove Steam Electric Station*, submitted as part of the application received on June 25, 2007, in which is included a description of how the facility

---

[34] *Id.* (emphasis added).

meets Best Technology Available (BTA) for minimizing Adverse Environmental Impact (AEI).

Within six months of permit issuance, the permittee shall submit an Impingement Mortality and Entrainment Characterization Study[] to the Water Quality Division. If it is later determined that the current CWIS configuration is not representative of BTA for minimizing AEI, this permit may be reopened to incorporate additional requirements.

The evidence in the record reasonably supports a conclusion that this permit provision is clear and enforceable. The permit itself requires that Oak Grove operate and maintain the CWIS as set forth in two particular documents submitted with Oak Grove's permit application. Those documents, in turn, describe the intake-structure technology Oak Grove uses and compares that technology to other technology. In other words, the permit requires Oak Grove to continue operating and maintaining its CWIS in the manner described in those documents. The general permit conditions in the OGSES permit also expressly state that the "permit is granted on the basis of the information supplied and representations made by the permittee during action on an application" and that the "application pursuant to which the permit has been issued is incorporated herein." Further, expert witnesses testified that the provisions were clear and enforceable.

RCOLOL argues that the two documents referenced in the permit render the permit's CWIS provision unclear and unenforceable because the wording in those referenced documents is descriptive rather than prescriptive. But assuming that characterization is correct, the descriptive nature of those documents—i.e., explaining what the CWIS is, how it is operated, and its technical features—became prescriptive when incorporated into the permit. For example, the referenced document titled *Supplemental Information for 316(b) BTA Determination* includes the following description of the OGSES cooling-water intake structure:

OGSES is a two unit coal-fired facility rated at 1760 MW (total) utilizing a closed-cycle recirculation system (a.k.a., once-through cooling water). OGSES has one CWIS, located on the southwest shoreline, within a large arm of the waterbody facing the main body of the reservoir. The CWIS has six bays, three for each Unit. Each of the six operating bays are equipped with one vertical circulating water pump, located downstream of the traveling water screens. Each of the six circulating water pumps has a rated capacity of 387.7 cfs (170,000 g.p.m.). There is a trash rack at the front of each intake which prevents large debris from reaching the traveling water screens. The traveling water screens are located about 13 ft downstream of the trash racks The screens for each CWIS are 14 ft. wide, are equipped with 3/8 in. square mesh. The intake structure is designed for passive fish escape, utilizing both the low traveling screen approach velocity and fish openings between the cells on each end. The design will allow fish to escape prior to capture on the traveling screens.

Once incorporated into the permit, the above description became a requirement, meaning that any deviation from that description, like deviation from any other permit requirement, would require a permit modification or could result in a violation of the permit.

Relatedly, RCOLOL's suggestion that a permit may not reference material submitted with the application is incorrect. TCEQ rules specifically allow incorporation by reference: "All permit conditions shall be incorporated either expressly *or by reference*. If incorporated by reference, a specific citation to the applicable rules or requirements must be given in the permit."[35] In fact, TCEQ rules require that the "provisions of a draft permit . . . shall be based on" documents in the administrative record, including permittee's application, "any supporting data furnished by the applicant," and "other documents contained in the supporting file for the draft permit."[36]

In addition to the CWIS-specific provision discussed above, the permit generally provides that "[t]he permittee shall at all times ensure that the facility and all its systems of

---

[35] 30 Tex. Admin. Code § 305.127(6) (TCEQ, Conditions to be Determined for Individual Permits) (emphasis added).

[36] *Id.* § 124.9(a)–(b) (TCEQ, Administrative record for draft permits when EPA is the permitting authority).

collection, treatment, and disposal are properly operated and maintained." Thus, because the CWIS is included within these systems, the permit requires Oak Grove to operate and maintain that system properly. In sum, the record reasonably supports a conclusion that the permit and the documents it references and incorporates create definite and understandable requirements. Accordingly, we overrule RCOLOL's second issue.

**TCEQ's antidegradation regulations**

In its third and fourth issues, RCOLOL complains that TCEQ failed to comply with its own antidegradation regulations. Specifically, RCOLOL argues that TCEQ (3) used an incorrect baseline water quality for its antidegradation analysis and (4) unreasonably determined that the discharge from the OGSES facility would have a de minimis impact on the water quality in the Twin Oak Reservoir. We will address these contentions in turn, after providing some background regarding TCEQ's antidegradation rules.

*Antidegradation*

Antidegradation is concerned with maintaining and protecting surface water that already meets or exceeds fishable/swimmable quality levels. Thus, Texas's antidegradation rule prohibits regulated activities from having any negative impact—i.e., a lowering of water quality—on surface water regardless of whether that impact meets water-quality criteria and uses.[37] Specifically, Texas's antidegradation rule, found in the Texas Surface Water Quality Standards,[38] affords

_____

[37] *See* 30 Tex. Admin. Code § 307.5 (TCEQ, Antidegradation); *see also, e.g.*, Lauren Kalisek, *The Principle of Antidegradation and its Place in Texas Water Quality Permitting*, 41 Tex. Envtl. L.J. 1, 2–3 (2010) (providing a more detailed discussion of antidegradation).

[38] *See* 30 Tex. Admin. Code §§ 307.1–.10 (TCEQ, Texas Surface Water Quality Standards).

17

three tiers of protection to the water in the state.[39]  Tier 1 "ensure[s] that water quality is sufficiently maintained so that existing uses are protected."[40]  Tier 2, at issue here, stipulates that regulated activity will not be allowed if it would "cause degradation of waters that exceed fishable/swimmable quality" unless "the lowering of the water quality is necessary for important economic or social development."[41]  "Degradation" is defined as "a lowering of water quality by more than a de minimis extent, but not to the extent that an existing use is impaired."[42]  Finally, Tier 3, which is not implicated here, requires that "[o]utstanding national resource waters"—e.g., waters within national parks or state parks—"must be maintained and protected."[43]

These antidegradation reviews are performed under a TCEQ-issued document titled *Procedures to Implement the Texas Surface Water Quality Standards*, which, stated generally, explains the procedures TCEQ uses when applying Chapter 307, including the antidegradation rule, to wastewater discharge permits.[44]  Regarding a Tier 2 analysis, TCEQ's *Implementation Procedures* provides that the "effect of a proposed discharge is compared to baseline water quality conditions in order to assess the potential for degradation of water quality."[45]  The applicable date

---

[39] *See id.* § 307.5(b).

[40] *Id.* § 307.5(c)(2)(A).

[41] *See id.* § 307.5(b)(2).

[42] *Id.* § 307.5(b)(2).

[43] *See id.* § 307.5(b)(3).

[44] *See Procedures to Implement the Texas Surface Water Quality Standards* 63 (Texas Comm'n on Envtl. Quality, Water Quality Division) (Jan. 2012) (commonly referred to as "*Implementation Procedures*" or "*IPs*").

[45] *Id.* at 63.

18

for establishing baseline water quality conditions is November 8, 1975,[46] but baseline conditions "are estimated from existing conditions, as indicated by the latest edition of the Texas Water Quality Inventory or other available information, unless there is information indicating that degradation in ambient water quality has occurred in the receiving waters since November 28, 1975."[47] Thus, stated generally, to determine whether the proposed regulated activity will result in degradation of water quality, TCEQ rules require a comparison of the baseline water-quality conditions with the conditions that will exist once the permitted activity begins. If this comparison shows no change in water quality, a water-quality improvement, or a de minimis—i.e., "trifling" or "negligible"[48]—lowering of water quality, the antidegradation policy is not implicated. If, however, the comparison shows a loss in water quality that is more than de minimis, the activity will not be allowed absent a showing that the loss is necessary for important economic or social development.[49]

### Did TCEQ use the proper baseline?

In its third issue on appeal, RCOLOL contends that TCEQ violated its own rules by using an improper baseline in conducting its Tier 2 antidegradation analysis of the OGSES permit. We disagree.

RCOLOL asserts that TCEQ used as a baseline "the hypothetical water quality in Twin Oak Reservoir resulting from operation of Oak Grove as authorized without the requested

---

[46] *Id.* (citing 40 C.F.R. § 131.3(e) ("Existing uses are those uses actually attained in the water body on or after November 28, 1975, whether or not they are included in the water quality standards.")).

[47] *Id.*

[48] *Black's Law Dictionary* 524 (10th ed. 2014) (defining "de minimis").

[49] *See* 30 Tex. Admin. Code § 307.5(b)(2).

19

amendment," when instead it should have used as a baseline the quality existing in the absence of any discharge from OGSES. But TCEQ did not use the hypothetical quality that RCOLOL suggests it did. The record shows that TCEQ and Oak Grove used as a baseline the water quality of Lake Limestone as it existed in 2007 because, when the permit amendment application was filed, Twin Oak Reservoir had been built, but had not yet been filled with water. Because OGSES operations did not begin until 2009, 2007 Lake Limestone water could not have been affected by discharge from OGSES and, even if operations had begun before that time, Lake Limestone's water quality would not have been affected by discharges in a downstream reservoir like Twin Oak Reservoir. But more to the point, there is substantial evidence in the record that supports TCEQ's use of 2007 Lake Limestone water as the baseline for the antidegradation analysis here: there is no reliable data dating back to 1975 that would establish a 1975 baseline for Twin Oak Reservoir; there is no data indicating that degradation in ambient water quality has occurred in Twin Oak Reservoir since 1975; Lake Limestone water is transferred to Twin Oak Reservoir to maintain its water level; and Lake Limestone water could not have been degraded by OGSES's discharge. In sum, the record provides reasonable support for TCEQ's use of 2007 Lake Limestone water as the basis for its antidegradation comparison. Accordingly, we overrule RCOLOL's third issue.

### De minimis impact of OGSES's discharge

In its fourth and final issue, RCOLOL argues that TCEQ unreasonably classified the discharge of 1.6 billion gallons per day (g.p.d.) of wastewater and stormwater runoff as having less than a de minimis impact on water quality. Arguing that the de minimis exception must be construed narrowly against the permitted activity, RCOLOL essentially argues that as a matter of law the

discharge of such a large quantity of wastewater and stormwater cannot have a de minimis effect on the water quality of the receiving body. Given our standard of review, we must disagree.

The issue before us is, again, whether there is some basis in the record for the agency's decision that the proposed discharge is allowable under Texas's antidegradation rule.[50] In addition to expert testimony that the permitted discharge would lower the reservoir's water quality by a de minimis or less-than de minimis extent, we conclude that the following substantial evidence in the record provides that basis:

- the 1.6 billion g.p.d. discharge is almost entirely attributable to once-through cooling water;

- only very small amounts of chlorine are added to the once-through cooling water;

- no other contaminants are added to the reservoir water;

- the chlorine that is added is in an amount that is "so tiny that [it] would not be measurable";

- the average dilution factor "will typically be greater than 1,517 to 1 (.066%) and TCEQ degradation policy cites a 10% use of existing assimilative capacity in a specific containment as the *de minimis* Tier 2 threshold";

- because the discharge flow rate is so high, any concentration of pollutants in the intermittent stormwater discharges "would be essentially not discernable" or not measurable; and

- the permit amendments do not change the previously permitted discharge at 002 of intermittent stormwater from the lignite-retention pond; but the permit amendments do allow the operator to, at its discretion, to discharge some or all of the coal-pile runoff at Outfall 001 rather than Outfall 002.

On motion for rehearing, RCOLOL urges this Court, among other relief requested, to explain "whether the de minimis exemption to Tier 2 antidegradation analysis is to be judged on the basis of the entire permitted discharge or only on so much of the discharge as is newly allowed

---

[50] *See City of El Paso*, 883 S.W.2d at 185 (explaining substantial-evidence review); *Pend Oreille*, 817 S.W.2d at 41 (same).

21

under the proposed permit amendment." We need not address that question here, however, because there is substantial evidence in the record, as set forth above, to support TCEQ's decision under either version of the analysis; namely that the newly-permitted discharge of cooling water from Outfall 001 and of intermittent stormwater from Outfall 002, whether considered separately or together, will not lower the reservoir's water quality by more than a de minimis extent.

We overrule RCOLOL's fourth issue.

## CONCLUSION

Having overruled each of RCOLOL's issues on appeal, we affirm the district court's judgment and TCEQ's decision.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed on Motion for Rehearing

Filed:   July 17, 2014